J-A31008-14 & J-A31009-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF S.W.C., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: C.C., | |
| Appellant | No. 939 MDA 2014 |

Appeal from the Decree May 5, 2014
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2013-0119

| | |
|---|---|
| IN THE INTEREST OF: S.W.C., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | |
| APPEAL OF: C.C., FATHER, | |
| Appellant | No. 933 MDA 2014 |

Appeal from the Order Entered May 6, 2014
In the Court of Common Pleas of York County
Juvenile Division at No(s): CP-67-DP-0000103-2012

BEFORE:  BOWES, OTT, and STABILE, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED DECEMBER 15, 2014**

C.C. ("Father") appeals from the order wherein the trial court changed the permanency goal for his son, S.W.C., from reunification to adoption and also from the decree that terminated his parental rights.  As the appeals flow

from identical facts and Father submitted one brief that combined both aspects of his arguments, we address the appeals collectively, and affirm.[1]

S.W.C. was born during May 2009 from an ongoing relationship between R.L. ("Mother") and Father. York County Office of Children and Youth, Services ("CYS") became involved with the family during May of 2012 due to allegations that Father sexually abused S.W.C.'s older half-sister over a four-year period. Father was determined to be an indicated perpetrator of abuse. On June 4, 2012, the victim, S.W.C., and another half-sibling, who subsequently leveled allegations of abuse against Father, were placed together in emergency shelter care. The latter allegations of abuse were also substantiated. However, Father was never charged with any crimes as a result of either allegation of sexual abuse. On June 11, 2012, the juvenile court adjudicated the three children dependent. The children remained together in the foster home, which is now a pre-adoptive resource.

The original permanency goal was reunification. In order to achieve reunification, CYS crafted a family service plan ("FSP") that directed Father, *inter alia*, to maintain contact with CYS, complete a sex offender evaluation and treatment recommendations, attend sex offender counseling until successfully discharged, participate in joint counseling with Mother if deemed necessary, and maintain a safe home. **See** CYS Exhibit 1. Three

_____

[1] On the same date, the trial court terminated the parental rights of R.L., S.W.C.'s birth mother. We address the appeal from that order separately.

permanency review hearings occurred at approximate six-month intervals between the June 2012 adjudication and October 2013. *See* Stipulation of Counsel, 1/3/14, at 2-3. During two hearings each, the juvenile court found that Father was in moderate compliance with the plan and that he made minimal progress toward alleviating the circumstances that necessitated CYS's intervention. *Id*. at 2-3. At all of the hearings, the juvenile court determined that CYS made reasonable efforts to finalize S.W.C.'s permanency goal, *i.e.*, reunification. *Id*. at 2-3.

On October 30, 2013, CYS filed a petition to change S.W.C.'s permanency goal from reunification to adoption and filed a petition to terminate Mother and Father's parental rights. The court convened evidentiary hearings on January 10 and February 27, 2014. CYS presented testimony from the family's caseworker and a family advocate who was associated with Catholic Charities. Father testified on his own behalf.

On May 5, 2014, the trial court granted CYS's petition, terminated Father's parental rights, and changed S.W.C.'s permanency goal to adoption. The trial court concluded that CYS established the statutory grounds to terminate parental rights outlined in § 2511(a)(1), (2), (5), and (8) and (b). This timely appeal and a concomitantly-filed Rule 1925(b) statement followed.

Father asserts seven questions for our review. We condense the first five issues, which Father argues collectively, into the following query: Whether the trial court erred in finding that CYS established the statutory

grounds for terminating his parental rights pursuant to § 2511(a)(1), (2), (5), and (8) when Father cooperated with CYS, demonstrated his parenting ability, and sought services to remedy the conditions that led to S.W.C.'s placement due to CYS's failure to provide him adequate assistance and services. *See* Father's brief at 5-6.

We reiterate the remaining issues as listed in Father's statement of questions presented.

> VI. Whether the trial court erred in finding that [CYS] established by clear and convincing evidence that termination of parental rights would best serve the needs and welfare of the child since the trial court discounted the bond the child had with the Father.
>
> VII. Whether the trial court erred in changing the goal from reunification to placement for adoption where a bond exists between the father and his child and the father continues to work and cooperate with [CYS] to promote reunification despite [CYS's] failure to fully engage the father and provide services that would aid reunification.

*Id*. at 6.

For judicial convenience, we review at the outset Father's complaint concerning the order changing S.W.C.'s permanency goal from reunification to adoption. The following principles are relevant.

> In cases involving a court's order changing the [court-ordered] goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a

- 4 -

comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa.Super. 2008) (citations omitted); *see also In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

Additionally, this issue is controlled by the Juvenile Act, 42 Pa.C.S. § 6301-6375, which was amended in 1998 to conform with the federal Adoption and Safe Families Act ("ASFA"), 42 U.S.C. § 671-679. In *In re M.S.*, 980 A.2d 612, 615 (Pa.Super. 2009) *citing* 42 Pa.C.S. § 6301(b)(1), we explained,

> Both statutes are compatible pieces of legislation seeking to benefit the best interest of the child, not the parent. . . . ASFA promotes the reunification of foster care children with their natural parents when feasible. . . . Pennsylvania's Juvenile Act focuses upon reunification of the family, which means that the unity of the family shall be preserved "whenever possible."

As such, child welfare agencies are required to make reasonable efforts to return a foster child to his or her biological parent. *In re N.C.*, 909 A.2d 818, 823 (Pa.Super. 2006). When those efforts fail, the agency "must redirect its efforts towards placing the child in an adoptive home." *Id*.

During permanency review hearings, trial courts must address the following considerations relevant to the child's well-being.

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) **The appropriateness and feasibility of the current placement goal for the child**.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child[.]

**(f.1) Additional determination.--**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) **If and when the child will be returned to the child's parent**, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

> (2) **If and when the child will be placed for adoption**, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f)(1)-(6) and (9), (f.1) (1) and (2) (emphases added). As we have indicated, "[t]hese statutory mandates clearly place the trial court's focus on the best interests of the child." *In re S.B.*, *supra* at 978 (citation omitted). Importantly, "[s]afety, permanency, and well-being of the child must take precedence over **all** other considerations." *Id*. (citation omitted; emphasis in original). Moreover, the burden is on the child welfare agency "to prove the change in goal would be in the child's best interest." *In re D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009).

Instantly, Father argues that, since he showed an interest in his son, complied with some components of the FSP, and proffered evidence that he could satisfy the child's housing needs, he made sufficient progress toward reunification to warrant maintaining the *status quo*. Father's assertion highlights the juvenile court's two findings of Father's "moderate" compliance following the permanency review hearings. Father stresses that his development occurred despite homelessness and what he characterizes as a dearth of assistance from CYS. Thus, he argues that the juvenile court committed an abuse of discretion in changing S.W.C.'s permanency goal from reunification to adoption. He concludes, "The weight of the evidence

indicates that [he] . . . appeared very close to reunification with the minor child." Father's brief at 30. For the following reasons, we disagree.

Notwithstanding Father's protestations to the contrary, the certified record demonstrates that Father was not on the verge of reunification with S.W.C. Indeed, while Father's **compliance** with the protocols outlined in the FSP was twice determined to be moderate, his **progress** toward actually alleviating the circumstances that necessitated CYS's intervention was found to be minimal on two occasions. *See* Stipulation of Counsel, 1/3/14, at 2-3.

Moreover, we reject Father's attempt to transfer the blame for his ineffectiveness to CYS. As we discuss further, *infra*, the agency provided Father every service that he requested and nothing was refused or denied. Additionally, while Father complains that CYS failed to form a "reunification team" to assist him, he never requested that relief. N.T., 1/10/14, at 39-40. In fact, although Father ultimately followed his counsel's cues and testified that he believed he would have benefited from a team of providers, Father's initial reaction to counsel's inquiry about the prospects of a team approach was, "Well, I like to do things on my own." N.T., 2/27/14, at 100-101.

Likewise, Father failed to complete the sex offender evaluation that he started with the Commonwealth Clinical Group. *Id*. at 97, 116-117. He initiated the evaluation process, but he was discharged after he failed to respect appropriate boundaries with his therapist. *Id*. at 116-117. Approximately fourteen months after the adjudication of dependency, Father

eventually completed a sexual abuse evaluation through a different service provider. N.T., 2/27/14, at 97-98. Even then, however, he failed to fulfill the recommended outpatient sex-offender treatment or therapeutic polygraph evaluation. N.T., 1/10/14, at 39; N.T., 2/27/14, at 100. Apparently, by the time he completed the sexual abuse evaluation, he believed that the loss of his son was a *fait accompli*. N.T., 2/27/14, at 118.

S.W.C. was adjudicated dependent during June 2012, when he was three years old. Approximately two years later, when CYS filed the petition for the goal change, he remained in foster care with no firm prospect of reunification with Father. S.W.C. is currently five years old and deserves permanency. The trial court considered the factors outlined in § 6351(f)(1)-(9), and concluded that it was in S.W.C.'s best interest to change his permanency goal from reunification to adoption. The juvenile court acknowledged that Father attended visitation regularly, held stable employment for approximately one year, and eventually completed the required sexual abuse evaluation, albeit late. However, during that same period that his son languished in what is now a pre-adoptive foster home, Father failed to maintain stable housing, refused to accept responsibility for his sexual abuse of S.W.C.'s older half-sisters, and declined to complete the recommended sexual offender's treatment regimen. Based on the foregoing, we conclude that the juvenile court properly weighed S.W.C.'s need for safety and permanency over all other considerations, and that it did

not abuse its discretion in concluding that changing the placement goal to adoption served his best interests. Accordingly, we will not disturb it.

Next, we address whether the trial court erred in terminating Father's parental rights pursuant to Pa.C.S. § 2511(a) and (b). We apply the following standard of review to an order terminating parental rights:

> In cases concerning the involuntary termination of parental rights, our review is limited to a determination of whether the decree of the termination court is supported by competent evidence. *Adoption of B.D.S.,* 494 Pa. 171, 431 A.2d 203, 207 (1981). The party petitioning for termination "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 502 Pa. 165, 465 A.2d 642, 644 (1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester*, 521 Pa. 300, 555 A.2d 1202, 1203–04 (1989).

*In re Adoption of L.J.B.*, 18 A.3d 1098, 1107 (Pa. 2011). As the ultimate trier of fact, the trial court is empowered to make all determinations of credibility, resolve conflicts in the evidence, and believe all, part, or none of the evidence presented. *In re A.S.*, 11 A.3d 473, 477 (Pa.Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id*.

Requests to involuntarily terminate a biological parent's parental rights are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)   The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)   The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5)   The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8)   The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.   The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing,

furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

The test for terminating parental rights consists of two parts. In *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007), we explained:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

We need only agree with the trial court's decision as to one subsection of 23 Pa.C.S. § 2511(a) and the subsection (b) analysis in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Herein, the certified record supports the trial court's determination that CYS established the statutory grounds to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b). Hence, we do not address the remaining statutory grounds.

We have explained our review of the evidence pursuant to § 2511(a)(8), as follows:

- 12 -

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In Re Adoption of M.E.P.*, 825 A.2d 1266, 1275-1276 (Pa.Super. 2003).

Thus, in order to satisfy the requirements of § 2511(a)(8) in the case at bar, CYS was required to produce clear and convincing evidence that: (1) S.W.C. has been removed from Father for at least twelve months; (2) the conditions which led to the child's removal continue to exist; and (3) involuntary termination of parental rights would best serve S.W.C.'s needs and welfare. *See In re Adoption of R.J.S.*, 901 A.2d 502 (Pa.Super. 2006).

Similar to the arguments leveled in opposition to the order changing S.W.C.'s permanency goal, Father argues that terminating his parental rights is not warranted because he maintained visitation, purchased gifts for his son's birthday, overcame the obstacles associated with homelessness, completed sex offender evaluation, and endured the lack of CYS assistance. Additionally, in an attempt to support the proposition that the conditions that led to S.W.C.'s placement ceased to exist, he points to his employment history and recent procurement of appropriate housing. Again, no relief is due.

Initially, we observe that the record does not sustain Father's claims

that CYS abandoned him or failed to provide him adequate assistance. As it relates to Father's housing predicament throughout the dependency proceedings, the following facts are relevant. Father was incarcerated briefly during May 2012 for violating a protection from abuse order that precluded him from contacting Mother and her children. He was released but later re-incarcerated for a parole violation between October 31, 2012 and December 29, 2012. After his release from prison, Father lived for more than one year with acquaintances in Biglerville, Pennsylvania. Prior to his incarceration, Father was essentially homeless between the spring and fall of 2012. However, by the time that Father testified at the evidentiary hearing on CYS's petition to terminate his parental rights, Father had obtained a two-bedroom residence in Fairfield, Pennsylvania.

Father criticizes CYS for failing to proffer an array of reunification services to assist him in finding an appropriate residence. Karen Beard, the caseworker assigned to S.W.C., confirmed that Father was not provided assistance to rectify his homelessness. N.T., 1/10/14, at 96. To her knowledge, CYS did not assign a team to help him obtain housing. *Id*. Nor did she know whether Father was referred to any housing assistance programs. *Id*. at 96. However, she explained that CYS did, in fact, perform background checks on Father's housemates, Mindy Caski and Charles Bowers. *Id*. at 96-97. Although the investigations did not return any prior criminal records, the home was never considered as a placement option for

S.W.C. because, by the time Father found a stable home with his friends, he was no longer a viable placement option. *Id*. at 97-98. Accordingly, she never inspected that home to determine if it would be a suitable residence for S.W.C. *Id*. at 97.

Moreover, to the extent that Father assails CYS's efforts generally, the record reveals that CYS provided Father a range of case management services, referrals to Commonwealth Clinical Group and Triad Treatment Specialists, and transportation to and supervision of visitations. *Id*. at 39. Father eventually completed the sex offender evaluation through Triad Treatment Specialists, but he nonetheless failed to enroll in the recommended treatment programs. Furthermore, Ms. Beard testified that, to her knowledge, Father did not request that the agency assign a service team to assist him. *Id*. at 39-40. Likewise, she could not identify any requested services that the agency refused to provide to Father. *Id*. at 39-40.

In relation to Father's specific complaints regarding the manner in which the agency conducted visitation and administered the FSP, Ms. Beard testified that she supervised Father's visitations with S.W.C. since July of 2013. *Id*. at 87. She explained that the supervised visitation never progressed beyond agency supervision because Father's housemates, whom Father proposed to supervise the visitations, were not committed to the supervision procedures and Father did not proffer any other alternatives.

*Id*. at 118, 125.

Ms. Beard also outlined her interactions with Father during the dependency proceedings. She received the assignment during June of 2013 and first met Father on July 25, 2013. *Id*. at 87. While she spoke with Father briefly to reschedule a visitation, she explained that she never reviewed the FSP goals with Father because the plan had been communicated to him before she was assigned to the family. *Id*. at 88, 89-90. Instead, following the September 17, 2013 permanency meeting attended by Father, Ms. Beard advised Father's then-counsel to instruct Father to adhere to the agency's directions. *Id*. at 88-89. In total, CYS mailed three FSPs to Father, and he never contacted the agency about the documents or requested clarification. *Id*. at 124. Additionally, he never mentioned the FSPs during the weekly visitations with S.W.C. *Id*.

CYS is not entirely blameless. Ms. Beard confirmed that Father was not invited to the blended perspectives meeting during February 2013 or a family group decision-making meeting that occurred the ensuing April. Similarly, CYS failed to inform Father of S.W.C.'s mental health evaluation scheduled for October 9, 2013, and it does not appear from CYS's documentation that Father was provided a copy of the evaluation report. *Id*. at 114. Upon further examination, however, Ms. Beard clarified that the child's evaluator mailed to Father a copy of the letter scheduling the evaluation. *Id*. at 121. Nevertheless, Father failed to contact CYS in order

to address the pending evaluation. *Id*. In fact, during the nineteen months prior to the evidentiary hearing that S.W.C. was in placement, Father failed to ask CYS about any specific concerns or issues with his son. *Id*. at 122.

In the same manner that Father failed to take the initiative to become involved in his son's mental health evaluation, Father willfully stood on the sidelines throughout most of the dependency proceedings. Stated simply, the record bears out that Father never asked CYS about any of the information that he now claims the agency withheld from him. N.T., 2/27/14, at 113. He did not attempt to identify S.W.C.'s physicians or request that CYS inform him when the child was scheduled for appointments or therapy. *Id*. He also conceded that, although he consistently attended the permanency review hearings, he failed to assert during those proceedings that he felt that CYS was failing him. *Id*. at 114. Moreover, Father was fully aware of his right to ask questions and proffer statements during the hearings. *Id*. at 133. Accordingly, for all of the foregoing reasons, and mindful of the juvenile court's consistent findings that CYS made reasonable efforts to assist reunification, we reject Father's attempt to call CYS's administration of this case into question. While the agency's interaction with Father was not the desired model of communication, the agency certainly did not abandon Father in his efforts to reunify with S.W.C. Father's argument to the contrary is unpersuasive.

Next, we examine whether the trial court erred in concluding that CYS

- 17 -

satisfied its burden of proving the statutory grounds to terminate Father's parental rights under § 2511(a)(8). First, it is undisputed that CYS satisfied the threshold requirement of § 2511(a)(8) since S.W.C. had been removed for approximately seventeen months on the date that CYS filed its petition to terminate Father's parental rights. Furthermore, as discussed below, the certified record reveals that the pertinent condition that led to S.W.C.'s removal from the home in June 2012, *i.e.*, the risks associated with Father's untreated sexual proclivities, continued to exist and that terminating Father's parental rights would best serve S.W.C.'s needs and welfare.

Between October 2012 and October 2013, Father provided S.W.C. a bicycle for his birthday and children's books. N.T., 1/10/14, at 43-44. He did not send him any other gifts or cards during that period. *Id*. at 43. Father was not involved in his son's preschool activities beyond one Winterfest event at the child's Head Start program. *Id*. at 45, 92. Likewise, he did not participate in S.W.C.'s therapy sessions or inquire about when the sessions or other medical appointments were scheduled. *Id*. at 46. Additionally, Father was not involved with his son's then-recent diagnoses of oppositional defiant disorder ("ODD") and adjustment disorder with anxiety. *Id*. at 45-46. While there is a concern that S.W.C. also may have attention deficit hyperactivity disorder ("ADHD"), his scheduled neuropsychological evaluation had not occurred when the evidence was presented. *Id*. at 46. Although Ms. Beard informed Father of the appointment, she did not invite

him to the evaluation because the future of Father's parental status was uncertain. *Id*. at 92.

Father attended sex offender counseling with Commonwealth Clinical Group, but he was unsuccessfully discharged during November 2012 following an incident where he made physical contact with a therapist. *Id*. at 107-108, 113-114; N.T., 2/27/14, at 115-116. Additionally, the agency does not have any documentation that he completed sexual offender therapy, the sexual history polygraph test, or the ABEL sexual offender screen as recommended by the FSP. N.T., 1/10/14, at 122-123. Critically, since the initial phase of the FSP, Father's inability to finish the sex offender evaluation was an ongoing issue. *Id*. at 123. CYS transmitted information to Father concerning a sex offender assessment at Triad Treatment Specialists as an alternative to the evaluation terminated by Commonwealth Clinical Group. Nevertheless, Father did not comply with the requirement for his sexual evaluation until August 2013, approximately six weeks before CYS filed the underlying petitions. *Id*. at 123. By that juncture, however, the agency was no longer in a position to commit further resources to Father. *Id*. at 123, 135.

Upon learning of the agency's decision to shift its focus toward adoption, Father declined to submit to the therapeutic polygraph or to pursue the treatment regimen recommend by the Triad Treatment evaluators. N.T., 2/27/14, at 118. Hence, Father not only failed to make

progress addressing the issues that led to S.W.C.'s placement, but also failed to avail himself of the services that the agency could have provided. He delayed completing the sexual offender evaluation, and, upon completing that assessment, he refused to engage in the recommended treatment regimen. Father's rejection of the treatment protocols underscores the fact that he has yet to resolve the issues that prevented him from caring for his son.

In light of these facts, Ms. Beard concluded that it was in S.W.C.'s best interest to prepare the child for adoption into a safe and stable home where he would receive adequate care and protection. N.T., 1/10/14, at 58. She agreed that "fundamentally we're in the same position today as we were when the agency became involved with this family in addressing . . . [Father's] sexual abuse issues[.]" *Id*. at 59. She testified that there is still a lot that remains to be accomplished and that she cannot discern a light at the end of the tunnel. *Id*.

The foregoing evidence sustains the trial court's determination that CYS proved by clear and convincing evidence the statutory grounds to terminate Father's parental rights to S.W.C. pursuant to § 2511(a)(8). S.W.C. has been removed from Father for at least twelve months; the conditions that led to S.W.C.'s removal continue to exist; and, as discussed *infra*, involuntary termination of parental rights would best serve S.W.C.'s needs and welfare. Accordingly, we find that the record supports the trial

court's conclusion that CYS satisfied the statutory requirements to terminate Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8).

Next, we address whether the trial court abused its discretion in finding that CYS presented sufficient evidence to demonstrate by clear and convincing evidence that terminating Father's parental rights and permanently severing the existing bond between him and S.W.C. would best serve the child's needs and welfare pursuant to § 2511(b). While the Adoption Act does not mandate that the trial court consider the effect of permanently severing parental bonds, our case law requires it where a bond exists to some extent. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993).

The extent of the trial court's bond-effect analysis depends upon the circumstances of a particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008). We have emphasized that, while a parent's emotional bond with his child is a major aspect of the § 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the trial court when determining what is in the best interest of the child. *In re K.K.R.-S.*, 958 A.2d 529, 535-536 (Pa.Super. 2008). Indeed, the mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

As we explained in *In re K.Z.S.*, *supra* at 763 (emphasis omitted),

In addition to a bond examination, the court may equally emphasize the safety needs of the child under subsection (b), particularly in cases involving physical or sexual abuse, severe child neglect or abandonment, or children with special needs. The trial court should also examine the intangibles such as the love, comfort, security and stability the child might have with the foster parent. Another consideration is the importance of continuity of relationships to the child and whether the parent child bond, if it exists, can be severed without detrimental effects on the child. All of these factors can contribute to the inquiry about the needs and welfare of the child.

*See also In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010) (orphans' court can emphasize safety needs, consider intangibles, such as love, comfort, security, and stability child might have with the foster parent, and importance of continuity of existing relationships).

Herein, the trial court concluded that severing the parental bond and freeing S.W.C. for adoption was in the child's best interest because the parental bond that nurtures safety, security, and permanency exists between S.W.C. and his foster parents rather than with Father. *See* Trial Court Opinion, 5/6/14, at 32. Our review of the certified record confirms the trial court's conclusion.

Initially, we review Ms. Beard's testimony concerning S.W.C.'s development in foster care. Ms. Beard related that S.W.C. was four years old as of the date of the evidentiary hearing. N.T., 1/10/14, at 44. He engages in negative behaviors associated with his ODD, adjustment disorder, and potential ADHD diagnosis. *Id*. at 46. His scheduled neuropsychological evaluation had not occurred when the evidence was

presented.  *Id*.  S.W.C. was referred for play therapy but remains on a waiting list.  He has been in a Head Start program since September 2013. *Id*. at 44.  He is excelling in the classroom; however, he still experiences disruptive outbursts.  N.T., 2/27/14, at 12.

Next, we address the nature of S.W.C.'s bond with Father.  Ms. Beard testified that Father has weekly supervised visitation with S.W.C. from 6:00 p.m. to 7:30 p.m. on Thursday evenings, and that Father attended the visitations consistently when he was not incarcerated.  N.T., 1/10/14, at 29, 122.  The visitations were briefly scheduled for twice per week, but it was scaled back after the schedule proved too demanding for S.W.C.  *Id*. at 102.

Ms. Beard supervised approximately seven of Father's visitations with S.W.C.  *Id*. at 99.  S.W.C. is happy to see Father during the visitations and greets him excitedly, "daddy, daddy, daddy."  *Id*. at 34.  Although Ms. Beard observed a bond between Father and S.W.C., she characterized that relationship as akin to playmates.  *Id*. at 35, 100.  She explained, "[Father] appears sometimes like they [have] more like a playmate bond, like sometimes he also appears a little hesitant to discipline [S.W.C.] or be firm with him at times."  *Id*.  For example, on one occasion, Father failed to admonish his son for running down the hallway in the agency's offices.  *Id*. at 100.  When Father does correct his son, it takes multiple prompts to get the child back on track.  *Id*. at 35.  There was also an issue with Father ignoring CYS's request to bring more appropriate snacks than candy and

junk food for his son to eat during the evening visitations. *Id*. at 100-101. Despite the agency's appeal for healthier options, Father persisted in supplying S.W.C. with large quantities of junk food, chocolate, and sugary snacks. *Id*. at 101-102.

Emily Verschoor, the family advocate that Catholic Charities assigned to this matter, testified that she was involved with the case between July 2013 and December 2013. *Id*. at 138. Her duties were, *inter alia*, to assist with reunification and support CYS generally. *Id*. at 139. While she never supervised any of Father's visitations with his son, she noted that, during the first two months of supervising Mother's scheduled biweekly visitations with S.W.C. and his sisters, she observed that S.W.C. consistently requested to visit Father during those periods. *Id*. at 173. She further noted that S.W.C. was "crestfallen" when the requests were denied. *Id*. at 174.

In relation to the connections S.W.C. shares with his half-sisters and pre-adoptive foster family, Ms. Beard stated that she visited S.W.C. and his half-sisters in the family's home once per month since she received this assignment. *Id*. at 33. She indicated that S.W.C. is particularly attached to his half-sisters, especially the younger girl, and the foster parents are committed to adopting all three children. *Id*. at 36, 49-50. Similarly, Ms. Beard testified that S.W.C. bonded with all of the members of the foster family, and he is very happy in the home. *Id*. at 33. Ms. Beard added that S.W.C. enjoyed a particularly close relationship with his foster father, and

that, unlike his relationship with Father, S.W.C. followed his foster parents' prompts. *Id*. at 35. Ms. Beard also pointed out that S.W.C. has never inquired about Father during her visits to the foster home. *Id*. at 35. In fact, she opined the child's bonds were comparatively stronger with his foster parents than Father. *Id*. at 36. In sum, she concluded that S.W.C. would not suffer any long-term negative impacts if the court terminated Father's parental rights. *Id*. at 36, 59.

As highlighted by the foregoing evidence, the certified record supports the trial court's needs and welfare analysis pursuant to § 2511(b). Although a bond exists between S.W.C. and Father, that bond is analogous to playmates rather than a father and son. While S.W.C. is excited to see Father during the supervised visitations and clearly prefers that interaction over Mother's company, S.W.C. does not look to either parent for guidance and he did not ask about Father outside of the supervised visitation. *Id*. at 35.

The evidence confirms that, in contrast to the affable relationship and playful interactions that S.W.C. enjoys with Father, S.W.C.'s primary attachments are to his pre-adoptive foster parents and his two half-siblings, whose adoption into the same family is pending. The meaningful bonds with the foster family reveal the hallmarks of healthy parent-child and sibling relationships, including closeness, security and emotional attachment. The fact that S.W.C.'s primary emotional attachment is with his foster parents

rather than Father is a significant factor in evaluating his developmental and emotional needs and welfare. *See In re K.Z.S., supra* ("the bond between [the child] and [foster mother] is the primary bond to protect, given [the child's] young age and his very limited contact with Mother"). Hence, we do not disturb the trial court's determination that permanently severing the friendship-type bond between Father and S.W.C. will not be detrimental to the child.

In sum, mindful of the additional factors that we indicated should be emphasized during the needs-and-welfare analysis in *In re K.Z.S.*, *supra* at 763, such as "the love, comfort, security and stability the child might have with the foster parent" and the importance of continuing that beneficial relationship, we find that the record confirms that terminating Father's parental rights best satisfies S.W.C.'s developmental, physical, and emotional needs and welfare. We emphasize that it is highly beneficial that S.W.C. and his half-sisters share the same pre-adoptive foster home.

For all of the foregoing reasons, we affirm the trial court order changing S.W.C.'s permanency goal and the decree terminating Father's parental rights to S.W.C. pursuant to § 2511(a)(8) and (b).

Order and decree affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/15/2014