431 A.2d 203

**In re ADOPTION OF B. D. S., A Minor.**

**Appeal of K.S.L.**

Supreme Court of Pennsylvania.

Argued Jan. 26, 1981.

Decided July 2, 1981.

---

1. Appellant does not contest the sufficiency of the evidence for the other offenses.

172

Z. R. Bialkowski, Jr., Scranton, for appellant.

Walter S. Frankowski, Jr., Honesdale, for appellee.

Before O'BRIEN, C. J., and ROBERTS, NIX, LARSEN, FLAHERTY and KAUFFMAN, JJ.

## OPINION OF THE COURT

O'BRIEN, Chief Justice.

This is an appeal by the natural mother from a decree entered in the Court of Common Pleas of Wayne County, Orphans' Court Division, denying the involuntary termination of the natural father's parental rights in their minor child B.D.S. Appellant petitioned the Orphans' Court alleging that the father "failed, neglected and refused to perform parental duties toward said child since September [sic] 1973 [sic] and his conduct toward said child evidences a settled purpose of relinquishing parental claim to said child."[1] A hearing was held on the petition on January 4, 1978. On January 23, 1979, the Orphans' Court denied the petition on the grounds that appellant "failed by the fair preponderance of the credible testimony to establish conduct on the part of [appellee] sufficient to terminate his parental rights." Appellant now argues that the findings of the Orphans' Court are not supported by evidence in the record, the testimony of appellee was not believable and appellee's attempts to maintain contact with his child do not evidence a firm refusal to yield to obstacles imposed by appellant. We disagree and affirm the Orphans' Court decree.

The record reveals that at the time the child was born, April 1, 1973, appellant, the natural mother, lived with the paternal grandparents of B.D.S. Appellee, the natural father, was serving in the United States Marine Corps in Quantico, Virginia. The child's parents married April 29, 1973, and appellant continued to reside with her husband's parents until the end of May, 1973. During that time

1. Section 311 of the Adoption Act provides as follows:
 "The rights of a parent in regard to a child may be terminated after a petition filed pursuant to section 312, and a hearing held pursuant to section 313, on the ground that:
 "(1) The parent by conduct continuing for a period of at least six months either has evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties."
 Act of July 24, 1970, P.L. 620, No. 208, art. III, § 311, 1 P.S. § 311 (Supp. 1980–81).

appellee was able to come home every week or every other week.

In late May, 1973, during a week when appellee was unable to obtain leave, appellee's father asked appellant to leave their home. She had returned home at 4:00 a.m., in the company of another man (her present husband) after journeying to New York State "to drink." She was not permitted to take the child at that time because of the late hour. Appellee, notified of the incident, came home at his earliest opportunity on emergency leave. Shortly after appellee returned to the Marine base, appellant filed a petition for habeas corpus to regain custody of B.D.S. Prior to the hearing, however, appellant went to appellee's parents' home and removed the child from the premises. That evening appellant moved in with her present husband and his parents. Again, notified of what had occurred, appellee returned home on leave.

The record discloses that at the hearing on the petition appellant's testimony was fraught with inconsistencies. She claimed on direct examination that neither appellee nor his family contacted her about B.D.S. after August, 1973. However, on cross-examination, she admitted, *inter alia*, that appellee visited her on or near Thanksgiving, 1973, requesting to see B.D.S. and further admitted that an Easter basket for B.D.S. was left on the porch of their trailer the day after Easter, 1974. She testified the basket contained a note signed by appellee which was actually, she claimed, from appellee's mother (she recognized the handwriting). Appellant admitted throwing the Easter basket in the trash. Not only is this testimony contrary to her prior testimony that appellee and his family sent no gifts, it is also directly contrary to her testimony on rebuttal that she did not bother to read the note.

Appellant's present husband, R.M.L., also testified that appellee and his family never telephoned, visited or sent cards or gifts. He too, however, admitted to finding the Easter basket from appellee and throwing it in the trash. R.M.L.'s parents recited similar testimony, claiming that

appellee never attempted any communication with appellant or their family concerning B.D.S.

The natural father, on the other hand, testified that during the preceding three and one-half years his attempts to contact appellant about B.D.S. were futile and were further impeded by appellant's frequent changes of residence. During the first year following the parties' separation appellee was serving in the Marine Corps. Appellant and the child lived with R.M.L. and his family for about eight months of that year. Appellee testified that he was permitted two visits with B.D.S. during this time, both occurring when he was home on leave. Also during that time he began monthly payments to appellant for B.D.S.' support pursuant to court order. The support action apparently was initiated by the Department of Public Welfare in the first months following the parties' separation. Appellee testified that after making two to four support payments appellant refused to accept them. At that time she also told appellee she would not permit him to see the child. Thereafter, whenever appellee was home on leave and telephoned appellant to arrange a visit with B.D.S., her father-in-law refused to allow him to speak to her; at times he simply hung up on appellee.

In January, 1974, appellant and R.M.L., now married, and B.D.S. moved to a trailer in an adjacent community where they lived for one year. Appellee remained in the Marine Corps for six months of that year. Appellant, who did not have a listed telephone number also did not inform appellee or his family of her change of residence. Nevertheless, appellee discovered their location and attempted to visit B.D.S. while home on leave for Easter. Upon finding no one home, appellee, in the company of his sister, left an Easter basket with a note attached on the porch. When he returned the next day, again no one was home; the Easter basket lay discarded and destroyed in the trash.

In July, 1974, appellee was discharged from the Marine Corps. Shortly thereafter appellant moved into her husband's parents' home again. Appellee testified that he was

not permitted to speak to appellant when he telephoned her there and his cards and letters went unanswered. Testimony also indicated that appellant's in-laws and appellee's parents had been involved in an altercation which resulted in an action being filed before a district magistrate. Appellee testified that as a result of this incident appellant's father-in-law told him never to set forth on their property. Appellee also testified that he went to Legal Aid but did not meet their income guidelines.

A year before the hearing appellant moved again, to a home on property adjacent to appellant's in-laws. Appellee testified that he was not informed of that move either; appellant acknowledged that fact.

Appellee's sister testified that she was permitted to visit with B.D.S. but appellant told her that no one else in the family, including appellee, was permitted to see the child. Appellee's parents testified to substantially similar impediments imposed by appellant, her husband and his family. At the hearing appellee's mother described various gifts that appellee and his family had purchased for B.D.S. over the years but were never permitted to deliver to the child. At appellant's counsel's request, appellee's mother displayed each gift, named who bought it (some were purchased by appellee and some by his parents) and described the occasion for which each had been purchased.

In addition to the above testimony, the child's mother, just weeks after removing B.D.S. from appellee's home, began calling B.D.S. by a new first name and also changed his middle name to that of her present husband. As the hearing court determined, this behavior "demonstrates a design by [appellant], her husband and her in-laws to deter [appellee] from the performance of his parental duties." Hearing Court Opinion, p. 3.

On the basis of the testimony, the Orphans' Court concluded that the activities of appellant and her husband's family prevented appellee from establishing and maintaining a parental relationship with his son. Our standard of

review in cases of involuntary termination of parental rights is well-settled. We will not reverse a decree of the Orphans' Court if it is supported by competent evidence. *In re L.A.G.*, 490 Pa. 85, 415 A.2d 44 (1980). Furthermore, where the hearing court's findings are supported by competent evidence of record, "we must affirm the hearing court even though the record could support an opposite result." *Matter of Kapcsos*, 468 Pa. 50, 54, 360 A.2d 174, 176 (1976). Our review of the record convinces us that the Orphans' Court findings are supported by competent evidence; thus, they will not be disturbed on appeal. *In re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978).

 The essence of appellant's argument is that she did, contrary to the Orphans' Court finding, sustain her burden of proof, and that appellee's testimony was not believable. This contention is totally without merit. The trier of fact is the sole judge of credibility. *In re Green*, 486 Pa. 613, 406 A.2d 1370 (1979), and we will not usurp this function of the hearing court.

A similar pattern of barriers existed in *Adoption of S. H.*, 476 Pa. 608, 383 A.2d 529 (1978). In that case the natural mother sought to terminate the parental rights of the natural father. Following a hearing the Orphans' Court denied the petition on the grounds that the father affirmatively performed his parental responsibilities as best he could. The testimony indicated that after the parties' separation in *Adoption of S. H.* the father was unable to locate his ex-wife and child, and his former mother-in-law refused to disclose their location. When the father finally located the child, his ex-wife refused to permit visitations. Shortly thereafter he was incarcerated. He testified that he sent letters and cards, all of which were unacknowledged and unanswered. When he was released from prison, the father tried calling his ex-wife but he claimed she would hang up on him. Two months later he was incarcerated again. During his confinement he sought the assistance of the American Red Cross in contacting his son. Through the organization's efforts the father discovered that his former wife was seeking to involuntarily terminate his parental rights.

■ The appellant in *Adoption of S. H.* argued that the Orphans' Court findings were unsupported by the record and the evidence believed by the court was not credible. We stated there, and re-affirm here,

> "A parent will not be found to have 'failed' or 'refused' to perform parental duties, or to have 'evidence[d] a settled purpose of relinquishing parental claim to the child,' id., so long as he or she 'use[s] all available resources to preserve his parental relationship' and 'exercise[s] reasonable firmness in declining to yield to obstacles' . . . . "

*Id.,* 476 Pa. at 610, 611, 383 A.2d at 530, *Quoting, Adoption of M.T.T.,* 467 Pa. 88, 96, 354 A.2d 564, 568 (1976) and others.

Similarly, in *In re D.J.Y.,* 487 Pa. 125, 408 A.2d 1387 (1979), we held that the natural mother's failure to maintain contact with her child was attributable to the paternal grandparents' deliberate actions designed to thwart her attempts to contact her child. As here, the record in *In re D.J.Y.* contained conflicting testimony. The paternal grandparents testified that for a three year period prior to the hearing the natural mother never contacted, met or contributed to the support of her child. The natural mother, conversely, described the continuing steps she took to contact her child. She claimed that all attempts to contact D.J.Y. were impeded by her husband and his parents. They threatened to call the police if she ventured onto their property and the gifts the mother sent were never given to the child. On the basis of the testimony the Orphans' Court concluded that the activities of the former spouse and in-laws prevented the mother from maintaining a parental relationship with her son. Following our review of the record in that case, we affirmed.

■ The above cases are strikingly similar to the instant case.[2] Although we have held that a parent must make an

---

2. *Cf. In re J.L.Z.,* 492 Pa. 421, 421 A.2d 1064 (1980) and *In re Adoption of J.S.M.,* 492 Pa. 313, 424 A.2d 878 (1981). The natural father in *J.L.Z.* made a conscious decision not to visit his child in order to avoid confrontation with his former wife and to prevent an

effort to maintain communication and association with his or her child, *Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975), all circumstances must be considered when analyzing a parent's performance or non-performance of parental obligations. *In re R.W.B.*, 485 Pa. 168, 401 A.2d 347 (1979). A parent's performance must be measured in light of "what would be expected of an individual in circumstances in which the parent under examination finds himself." *In re Adoption of David C.*, 479 Pa. 1, 387 A.2d 804 (1978). *See also, In re Adoption of M. M.*, 492 Pa. 457, 424 A.2d 1280 (1981).

The instant matter is unlike a case where a parent offers excuses why contact with the child did not occur. It is instead a case involving a pattern of obstacles and avoidance on the part of the mother and her new husband aimed at thwarting the father's attempts to maintain a parental relationship with his child. It is clear to us that appellant, her husband and his family evidenced a pattern of keeping B.D.S.' new life separate and distinct from any involvement with his natural father. As appellant had placed appellee in her own past, she also sought, apparently successfully, to place appellee in his child's past.

■ Appellee, warned to stay off appellant's property, was reduced to trying to contact his three-year-old child by telephone or through the mail. He testified to placing telephone calls, sending cards and letters and purchasing

exposure of the bitterness and animosity his ex-wife held toward him to the child during the visits. The Orphans' Court terminated the father's parental rights and determined that his testimony that his former wife impeded his attempts to see the child was *"not at all convincing." Id.* at 1068. (emphasis added) An added consideration in that case was the father's *refusal* to pay support.

In *Adoption of J.S.M.*, another similar case where the father argued that his parental rights should not have been terminated because his former wife placed numerous obstacles in his path, the Orphans' Court concluded that the father neither attempted contact with the child nor were there deliberate actions by the mother designed to thwart the father's attempts to contact J.S.M. Following our review of the record we stated, *"[h]ere, the [Orphans'] Court rejected the credibility of the evidence* offered to establish the excuse for appellant's derelictions and the record here supports that rejection." *Id.* at 880. (emphasis added)

gifts he could not deliver over the three and one-half year period between the parties' separation and the hearing. His testimony, believed by the Orphans' Court, demonstrated a design by appellant and her husband to deter appellee from the performance of his parental duties. The increasing frequency of cases similar to the present one convinces us of the need for a stern warning that obstructive behavior on the part of the custodial parent aimed at thwarting the other parent's maintenance of a parental relationship will not be tolerated, and certainly will not provide a sound basis for the involuntary termination of parental rights.

The decree of the Orphans' Court Division of the Court of Common Pleas of Wayne County is affirmed.

Each party to bear own costs.