**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.J.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.J.T., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1086 WDA 2024 |

Appeal from the Order Entered July 30, 2024
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  017-2024

BEFORE:  KUNSELMAN, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: February 19, 2025**

D.J.T. (Father), biological father of C.J.T. (Child or the Child), a son born in July 2016, appeals from the order granting the petition for involuntary termination (termination petition) of Father's parental rights filed by Child's biological mother, J.A. (Mother), pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).  After careful review, we affirm.

The orphans' court summarized the factual and procedural history underlying this appeal:

> [Mother and Father] were married on June 6, 2015.  Shortly after the Child was born, there was an incident during which Father became angry, threw the Child's [empty] bassinet, and … [destroyed property at the parties' rental] home, by kicking in the door [and causing other damage].  Mother fled the home shortly thereafter and moved in with her parents.
>
> Mother filed a Complaint for Divorce with a count for custody on April 10, 2017, seeking sole legal custody and primary physical custody of the [] Child.  On May 25, 2017, [the trial court

convened] a custody conciliation conference, after which [the court entered an order (custody order) that awarded] Mother … sole legal custody of the Child[, who was 10 months old at the time.[1]] Mother was awarded primary physical custody, and Father received supervised physical custody at times mutually agreed upon by the parties. Father was not present for the custody conciliation conference, as he was incarcerated in Westmoreland County Prison at that time and had made no arrangements to attend.

On February 5, 2018, [Child's] paternal grandmother, D[.Q. (Paternal Grandmother)], filed a Petition to Intervene, requesting periods of visitation with … Child while Father was incarcerated. The Petition to Intervene was withdrawn by consent of the parties, through counsel, on March 23, 2018.

…. During his incarceration, Father had no … contact with the Child. Upon his release [from prison[2]] in 2021, Father had supervised periods of physical custody with the [] Child, supervised by Paternal Grandmother or [Child's] paternal aunt[, K.T. (Paternal Aunt) (collectively, the original supervisors)]. Father had [supervised] visits with the Child one day during the week and one day on the weekend.

Father's supervised visits with the Child continued until April of 2023, when Mother made the unilateral decision to end visits between Child and Father.[3] It was Mother's opinion that Paternal

---

[1] We hereinafter refer to the action involving custody of Child as "the custody case." The limited certified record before us does not contain a copy of the custody order. In the instant case, at the time of the evidentiary hearing on the termination petition (termination hearing), the orphans' court took judicial notice of the custody order, which remained in place at that time. N.T., 6/27/24, at 104; **see also id.** (Father's counsel stating the custody order was docketed at "582 of 2017, and … I'm sorry[ that] I neglected to … [make] a photocopy of" the order).

[2] Father testified at the termination hearing that he "went to jail because [he] had [] ten [criminal] cases," based on actions relative to his illicit drug addiction. N.T., 6/27/24, at 43.

[3] Mother testified at the termination hearing that the last time Child saw Father was in April 2023. N.T., 6/27/24, at 7.

Grandmother and Paternal Aunt were unfit to supervise the visits.[4] Mother's reasoning stemmed from her belief that Paternal Grandmother enabled Father [with respect to his substance abuse issues]. Mother's concerns [regarding] Paternal Aunt related to substance abuse concerns, along with the fact that [Paternal Aunt's minor] child was removed from [Paternal Aunt's] custody. Currently, Mother and Paternal Grandmother are working on visits, and the Child is having video calls with Paternal Grandmother. Additionally, Mother [occasionally] brings the Child to meet Paternal Grandmother for [meals] or ice cream.

Mother unilaterally ended Father's supervised visits, as she felt Father was placing the Child in unsafe situations due to [Father's] substance abuse and anger[-]related issues. Mother elaborated by … [pointing out the incident wherein] Father had thrown the Child's bassinet across the room and [] attempted to kick in a door of the [parties'] home. Further, Mother testified to her version of a road rage incident [involving Father and Child (the road rage incident), which occurred in April 2023,] that [Mother] learned of from the Child. Mother stated that Father had to go to the hospital and get sti[t]ches [on his hand,] after punching a mirror on [another driver's] vehicle. Mother never reached out to Father requesting [that] he address her concerns, nor did Mother tell Father she was prohibiting further contact with him. Mother's position was that Father took no court action to resume visits with the Child [after she stopped them in April 2023],[5] and that her concerns [regarding the original] supervisors were sufficient to justify precluding any further visitation with the Child.

---

[4] Mother testified that she communicated her concerns regarding the original supervisors to Father. N.T., 6/27/24, at 7, 8. According to Mother, after she stopped Father's visits, he "never suggested … any sort of alternate … route that we could go in order for him to see" Child. *Id.* at 7; *see also id.* at 18 (Mother confirming that neither she nor Father suggested alternate supervisors for Father's visits).

[5] It is undisputed that in the custody case, Father never filed a petition for modification of the custody order or a petition for contempt. Father testified at the termination hearing that if the orphans' court denied Mother's termination petition, Father intended to file a petition for modification of custody and/or contempt in the custody case. N.T., 6/27/24, at 51-52, 58-59.

Orphans' Court Opinion, 7/30/24, at 2-4 (unpaginated) (footnotes added; capitalization and punctuation modified).

Mother filed her termination petition on January 29, 2024, seeking involuntary termination of Father's parental rights to Child under 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). Mother claimed "Father has failed to perform parental duties for a period in excess of six (6) months prior to the filing of the [termination] petition …. [] Father has not provided nurturing or financial care or support of … Child." Termination Petition, 1/29/24, Ex. 1 (capitalization modified). Mother further asserted, "Father has [] represented that he would not object to termination [of his parental rights], stating [to Mother in a text message,] 'when [Child] reaches eighteen [years of age, Child] can decide for himself.'" *Id.*

By order entered May 3, 2024, the orphans' court appointed Kelly Eshelman, Esquire (Attorney Eshelman or Participant), "as guardian *ad litem*" (GAL) for Child. Order, 5/3/24, at 1 (unpaginated). In the same order, the orphans' court granted Father's application for *in forma pauperis* (IFP) status and appointed Father counsel. *Id.* at 1-2 (unpaginated).

At the termination hearing, Father and Mother both testified, as well as Paternal Grandmother, Paternal Aunt, and Mother's husband, R.A.

(Stepfather). Child, who was nearly eight years old at the time of the termination hearing, did not testify.[6]

The orphans' court summarized the evidence presented at the termination hearing in its opinion:

> Mother lives in Hyde Park, Pennsylvania, with [Stepfather]. The [] Child has been in the custody of Mother since birth, with Mother being [Child's] primary caregiver. Mother and Stepfather have been in a relationship since 2020. Mother married Stepfather on March 18, 2024. Mother and Stepfather share a three-year-old [biological] child as well.
>
> [] Stepfather testified that he is a father figure to the Child and desires to adopt him.[7] [Stepfather] further reported that after visits with Father, the Child would smell of filth and cigarettes. Additionally, [Stepfather's] testimony alleged that Father would not feed the Child during visits, as the Child would return home hungry.
>
> Father [testified he] was incarcerated when the Child was ten months old and remained incarcerated until 2021. Father was unable to perform any parental duties for the Child while incarcerated and did not visit with the Child until [Father's] release in 2021. Father testified that during his supervised visits with the Child, they would play together and were affectionate towards one another. Father is currently unemployed but was recently approved for disability [benefits]. Father sustained bodily injury after … jump[ing] out of a hospital window during a moment of psychosis. Father was placed into a medically[-]induced coma in the hospital for a three-month period. For an additional three-

---

[6] As we elaborate *infra*, the record is silent with respect to Child's preferred outcome concerning termination of Father's parental rights. However, Mother testified at the termination hearing that she asked Child, "multiple times …, hey, do you want to give [Father] a phone call, [and] do you … miss your dad[? Child's] answer is always no." N.T., 6/27/24, at 21.

[7] Both Stepfather and Mother testified that if the orphans' court terminated Father's parental rights, they would permit Child to continue to have contact with Paternal Grandmother. N.T., 6/27/24, at 26, 36-37.

month period, Father stayed in a nursing home to help assist with his recovery. Father sustained lasting injuries and is now unable to work. Father reports that he was approved for state [disability] benefits in May of 2024. Father currently resides in a camper on [Paternal Aunt's] property. Father informed the [orphans'] court that he is still in [drug and alcohol] recovery and is receiving psychotherapy services.

Father provided the [orphans'] court with his version of the road rage incident. Father stated that another driver had cut off … [Paternal Aunt, while she was driving with Father and Child as passengers,] and had become aggressive towards [Paternal Aunt after both vehicles came to a stop]. Father [claimed he] stepped out of the vehicle to intervene and fell in the process, resulting in Father's sustaining [an] injury [to his hand]. Father testified that the [] Child remained in the vehicle at all times and there was no safety risk posed to the Child. Father also informed [the orphans'] court that in the event that the [termination] petition … is not granted, he fully intends to file for a modification of custody.

[] Paternal Aunt [testified that she] supervised visits between Father and the Child [following] Father's release from incarceration in 2021, until April of 2023. Paternal Aunt testified that Father has a good relationship with the Child. Paternal Aunt informed the court that Father purchased a birthday present for the Child last year and had Paternal Aunt leave it on Mother's porch. [Paternal Aunt] testified that Father lives in a camper on her property. Despite concerns from Step[f]ather [regarding] the Child returning from [Father's] visits hungry, Paternal Aunt stated that the Child was always fed when in Father's care. [Paternal Aunt] also testified that she did have substance abuse[-]related issues, but is working with [a rehabilitation program] to address her [issues]. [Paternal Aunt] further testified about the road rage incident that involved the Child. Paternal Aunt stated that a man cut her off while driving and pulled over in front of her vehicle. [According to Paternal Aunt, the driver] approached her vehicle in an aggressive manner. Father exited the vehicle and fell on the other man's car. [Paternal Aunt] reported that Father required no medical care following the incident.

[] Paternal Grandmother testified that Father and the [] Child have a positive relationship. Paternal Grandmother reports that the Child never displays any behavioral issues after ending visits with Father. [Paternal Grandmother] testified that she has

seen the Child on three occasions during the past year and desires to continue her relationship with [Child].

Orphans' Court Opinion, 7/30/24, at 4-6 (unpaginated) (footnote added; capitalization and punctuation modified).

At the termination hearing, Attorney Eshelman cross-examined Mother, Stepfather, and Father. *See* N.T., 6/27/24, at 22-25, 36-37, 77-79. Prior to the testimony of Paternal Aunt and Paternal Grandmother, the orphans' court stated to Attorney Eshelman that the court "forgot to check with [Attorney Eshelman] to make sure that [she] could represent" both Child's legal and best interests.[8] N.T., 6/27/24, at 81. The court then asked Attorney Eshelman whether she believed she could represent "[C]hild's legal and -- all the interests?" *Id.* Attorney Eshelman responded, "Yes, your Honor, I believe so." *Id.*

At the conclusion of the termination hearing, the orphans' court considered closing arguments from the parties. *See id.* at 105-15. The court

---

[8] "In cases involving children, the law acknowledges two separate and distinct categories of interest: a child's legal interests, which are synonymous with the child's preferred outcome, and a child's best interests, which the trial court must determine." *In re Adoption of L.B.M.*, 161 A.3d 172, 174 (Pa. 2017) (footnotes omitted). Our Supreme Court has stated, with respect to contested involuntary termination of parental rights proceedings, that 23 Pa.C.S.A. § 2313(a) "requires" an orphans' court to "appoint an attorney to represent the child's legal interests, *i.e.*, the child's preferred outcome[.]" *In re T.S.*, 192 A.3d 1080, 1082 (Pa. 2018) (citation and footnote omitted); 23 Pa.C.S.A. § 2313(a).

then asked Attorney Eshelman to state her position; Attorney Eshelman responded as follows:

> I join in [Mother's counsel's closing] statement [recommending termination of Father's parental rights], your Honor, and based on my interview with the Child[9] and my observations here in court today, I would humbly recommend to the court that the parental rights of Father be terminated so that [Child] may be adopted by [] Stepfather.

*Id.* at 115 (footnote added; capitalization modified). The orphans' court took the matter under advisement and deferred ruling on the termination petition.

By an order and accompanying opinion entered July 30, 2024, the orphans' court involuntarily terminated Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b).[10] Father timely filed a notice of appeal, simultaneously with a Pa.R.A.P. 1925(a)(2)(i) concise statement of errors complained of on appeal. The orphans' court subsequently issued a Rule 1925(a) opinion, stating it relied upon its prior reasoning contained in the July 30, 2024, opinion and order. Orphans' Court Opinion, 9/3/24, at 1.

Father presents the following issues for our review:

---

[9] Attorney Eshelman explained, through her questioning of Mother, that Attorney Eshelman interviewed Child three weeks prior to the termination hearing. *See* N.T., 6/27/24, at 22. However, Attorney Eshelman never stated Child's preferred outcome with respect to termination of Father's parental rights.

[10] The orphans' court determined that grounds for termination do not exist under 23 Pa.C.S.A. § 2511(a)(2). *See* Orphans' Court Opinion, 7/30/24, at 7-8 (unpaginated). The court found that Child "has never been without essential parental care, control, or subsistence necessary for his physical or mental well-being." *Id.* at 7 (unpaginated). *Cf.* 23 Pa.C.S.A. § 2511(a)(2).

- 8 -

I.   Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of Father under 23 Pa.C.S.A. § 2511(a)(1)[?]

II.  Whether the [orphans'] court erred in finding by clear and convincing evidence that the moving party met its burden under 23 Pa.C.S.A. § 2511(b) that the best interests of the Child are met by terminating Father's parental rights[?]

III. Whether the [orphans'] court erred in terminating Father's parental rights to Child despite the fact that [Attorney Eshelman] failed to provide the Child's legal position to the court, even though [Attorney Eshelman] represented to the court that she could represent both the Child's legal interest and his best interests[?]

Father's Brief at 4 (citations and capitalization modified).

We review an order involuntarily terminating parental rights for an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "A decision may be reversed for an abuse of discretion only upon a determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *In the Int. of K.T.*, 296 A.3d 1085, 1097 (Pa. 2023) (citation omitted).

The abuse of discretion standard in termination cases "is a highly deferential standard and, to the extent that the record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citing *In re A.S.*, 11 A.3d 473, 477 (Pa. Super. 2010)). Our Supreme Court "has repeatedly stated that in termination cases involving close calls, deference to the trial court's determination is particularly crucial." *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021) (citing, *inter alia*, *In the*

- 9 -

*Int. of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021), which states that "[w]hen a trial court makes a 'close call' in a fact-intensive case involving … the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions; the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court.").

> Even where the facts could support an opposite result, as is often the case in … termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*S.P.*, 47 A.3d at 826-27; *see also id.* at 826 ("[U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing[.]").

> This Court has stated that

> [i]n considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence[.]

*In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (internal citations and quotation marks omitted). "The standard of 'clear and convincing' evidence

is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis: "Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re B.J.Z.*, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted). If the court finds grounds exist to warrant termination under Section 2511(a), it must then assess the evidence relative to the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d at 830 (citation omitted).

Instantly, the orphans' court terminated Father's parental rights to Child pursuant to Section 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.** The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

**(1)** The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

\* \* \*

**(b) Other considerations.** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), … the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

This Court has stated that to meet the requirements of Section 2511(a)(1),

"the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the [t]ermination [p]etitions, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." **In re Z.S.W.**, 946 A.2d 726, 730 (Pa. Super. 2008). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child." **Id.** (quoting **In re Adoption of Charles E.D.M.**, 708 A.2d 88, 92 (Pa. 1998)).

**In re Adoption of B.G.S.**, 245 A.3d 700, 706 (Pa. Super. 2021) (citations modified).

Regarding the definition of "parental duties," the Pennsylvania Supreme Court has explained that

- 12 -

our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. **The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.**

*L.A.K.*, 265 A.3d at 592 (emphasis added; internal citations, quotation marks, and brackets omitted).

We have explained that in applying Section 2511(a)(1),

[t]he court should consider the entire background of the case and not simply[] mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re Adoption of A.C.*, 162 A.3d 1123, 1129 (Pa. Super. 2017) (citations and ellipses omitted; formatting modified). However, the General Assembly's emphasis on the six months immediately preceding the filing of the petition indicates the timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

Finally, this Court has recognized that

[w]here a parent is incarcerated, the fact of incarceration does not, in itself, provide grounds for the termination of parental rights. However, a parent's responsibilities are not tolled during incarceration. The focus is on whether the parent utilized resources available while in prison to maintain a relationship with

- 13 -

his … child. An incarcerated parent is expected to utilize all available resources to foster a continuing close relationship with his or her children.

Where a non-custodial parent is facing termination of his … parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has by devious means erected barriers intended to impede free communication and regular association between the non-custodial parent and his … child. Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances. A parent has the duty to exert himself, to take and maintain a place of importance in the child's life.

*In re B.,N.M.*, 856 A.2d 847, 855-56 (Pa. Super. 2004) (internal citations omitted). The *B.,N.M.* Court further stated that "a parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *Id.*

Instantly, Father challenges the orphans' court's determination that clear and convincing evidence exists to warrant termination of his parental rights under Section 2511(a)(1). *See* Father's Brief at 22-34. Father asserts "Mother did not establish that Father showed a settled purpose to relinquish his parental rights." *Id.* at 26. Father elaborates:

The termination petition was filed on January 29, 2024. Father had his family drop a birthday present off for the Child on July 4, 2023, just slightly more than six months before the termination petition was filed. Additional attempts were made in good faith by Father to see [Child]. Father testified, and Mother concedes,

- 14 -

that Father contacted Mother since Mother unilaterally stopped all visits between Father and Child….

*Id.* at 27 (capitalization modified).

Father maintains that before Mother stopped his visits in April 2023, for approximately two years, Father "had great visits with the Child on a regular weekly basis, with many overnights and weekends," pursuant to the custody order. *Id.* at 28. Father claims, "Mother did not offer any testimony whatsoever as to any problems during these weekly and weekend visits with Father for a two-year period." *Id.* at 24 (emphasis omitted). According to Father, Mother

intentionally obstruct[ed] Father's ability to see [] Child for the six months prior to the filing of the termination petition. Mother unilaterally stopped all visits in violation of the [] custody order, and would not return any form of communication from Father….

*Id.* at 34 (capitalization modified). Based on the foregoing, Father avers, 1) "it cannot be fairly stated or argued that Father in any way abandoned the Child," *id.* at 31; and 2) Father did not "fail[] to perform his parental duties to such an extent that termination is warranted, particularly in light of Mother's active efforts to thwart Father by unilaterally stopping all visits[.]" *Id.* at 34.

Father further claims that

even though Father did not file a modification petition or a contempt petition in [the] custody [case] due to Mother unilaterally stopping visits, Father did progress from incarceration to three years of crime[-]free and drug[-]free living, and gained a substantive and ongoing income from Social Security Disability.

- 15 -

*Id.* at 26 (capitalization modified); ***see also id.*** at 28 (Father asserting he previously "had financial concerns which prevented him from going to court to enforce the existing custody order that was in place[.]" (capitalization modified)).

Father relies upon ***In re Adoption of B.D.S.***, 431 A.2d 203 (Pa. 1981), wherein our Supreme Court held that

> obstructive behavior on the part of the custodial parent aimed at thwarting the other parent's maintenance of a parental relationship will not be tolerated, and certainly will not provide a sound basis for the involuntary termination of parental rights.

*Id.* at 208; Father's Brief at 24.

Mother counters that

> clear and convincing evidence exists that Father failed to provide essential parenting or contribute to the health, welfare, and needs of the [] Child, pursuant to Pa.[]C.S. § 2511(a)(1), as a result of [Father's] prolonged incarceration and psychotic episodes, and behavior since [his] release from prison in 2021 until the present time….

Mother's Brief at 8 (capitalization and punctuation modified). Mother contends that Father failed to perform any affirmative parenting act within the critical six-month period immediately preceding her filing of the termination petition. *Id.* at 10. Mother points out that "the last contact between the [] Child and Father [occurred in April 2023]. During this period of time, Father had text exchanges with Mother, and [] inquired as to how to give up his parental rights." *Id.* at 10.

- 16 -

Attorney Eshelman also argues Mother met her burden of presenting clear and convincing evidence to support termination under Section 2511(a)(1). *See* Participant's Brief at 11-13. Attorney Eshelman asserts "Father failed to take any action to enforce his parental rights to see and support" Child following Mother's stoppage of Father's visits in April 2023. *Id.* at 11. Attorney Eshelman elaborates that, in stopping Father's visits, Mother communicated to Father that the

> [original] supervisors were no longer acceptable and provided [Mother's] reasons. Father failed to suggest any other supervisors or seek relief through the [trial court in the custody case;] instead[, Father] offered to voluntarily terminate his parental rights. He did not even attempt to maintain consistent contact with the [C]hild, sending no letters and making no phone contact.

*Id.* at 12. Attorney Eshelman further emphasizes that Father has never financially supported Child. *Id.*

The orphans' court provided the following reasoning in support of its determination that termination is warranted under Section 2511(a)(1):

> Father testified that since April of 2023[,] he has had no contact with the [] Child. Mother's testimony provided that Father requested visits with the Child less than ten times since Mother ended supervised visits. [After Mother stopped Father's visits in April 2023,] Father never provided Mother with any alternate supervisor options to utilize, in order to preserve his supervised visits. Father stated that his financial circumstances were a barrier to paying for professional supervised visits. Additionally, Father stated that he did not petition the court [in the custody case] for a modification of custody, as he could not afford an attorney. In 2023, Mother obtained a final eighteen-month

- 17 -

protection from abuse [(PFA)] order against [Father,[11]] after Father failed to appear for the [PFA] hearing. In the [PFA] order, a provision was included stating that communication [between the parties] regarding custody [of Child] would not be a violation of the order. Father did not communicate with Mother after [the PFA] order was signed. Father used his fear of legal action by Mother as his reason for not requesting visits with the Child and for not contacting Mother.

Mother testified that Father has never provided financial support for the [] Child, although [Mother] never took action to file for child support. Father testified that during his period of incarceration, he sent the Child poems and letters at least twice per month. Father infrequently sent letters and pictures to the Child, since [Father's] release from incarceration, but has not sent anything since April of 2023. Father did not send gifts or cards to the [] Child, with the exception of having Paternal Aunt leave a birthday gift on Mother's porch for the Child …. Father was unable to recall the exact present he had purchased for the [] Child's birthday.

In text message exchanges between Mother and Father [(the text messages) sent after the stoppage of Father's visits in April 2023], Father inquired as to how to [voluntarily forfeit] his [parental] rights. ([Mother's] Exhibit 1[, p. 21]). Mother responded by asking Father if he was serious. Father replied he was "dead serious." [*Id.*] No further discussion occurred regarding Father's parental rights over the Child. [At the termination hearing, c]ounsel for Father contested [the text] messages[,] stating that Father did not really intend to relinquish his custody rights.

_____

[11] Though the record is unclear, it appears that Mother alleged in her PFA petition that Father sent her harassing text messages. N.T., 6/27/24, at 50. As Father testified, "[t]here was one [text] message where [Mother] asked [Father] if" what he wrote to Mother in his text message "was a threat, and [Father replied] specifically[, N]o." *Id.* Father asserted that after Mother filed her PFA petition, he was "scared to send any messages to [Mother], period, because" Father feared Mother would "call the cops[.]" *Id.* at 51; *see also id.* at 50 (Father testifying "the main reason why [he did not engage in] … any communication [with Mother was] because [he] didn't have any money for a lawyer[.]").

Father has not maintained any sort of contact with the Child for over a year and has not performed parental duties for the Child for the same duration of time. Additionally, Father has inquired [about] and contemplated signing over his parental rights, as evidenced in written correspondences with Mother.

As such, Mother has met her burden under 23 Pa.C.S.A. § 2511(a)(1).

Orphans' Court Opinion, 7/30/24, at 7-8 (unpaginated) (footnote added; capitalization modified).

Upon review, the record supports the orphans' court's findings and determination, and we discern no abuse of its discretion or error of law. Father repeatedly emphasizes Mother's unilateral stoppage of Father's visits in April 2023, based upon her objection to the original supervisors. He complains Mother's conduct, as well as Father's lack of finances to retain private counsel to mount a challenge in the custody case, constituted insurmountable obstacles to Father. However, it is undisputed that Father 1) is indigent and the orphans' court in the instant case granted him IFP status; 2) never petitioned, in the custody case, to obtain IFP status or for contempt/modification of the custody order; and 3) failed to propose alternate supervisors, in response to Mother's stoppage of visits in April 2023, to allow Father to resume visits with Child.[12] As stated *supra*, "a parent must act with

_____

[12] At the termination hearing, Father confirmed that the custody "order that was entered in 2017 [] permit[ted Father] supervised visits through an agency[.]" N.T., 6/27/24, at 66; **see also id.** (Father testifying he was "confused" with respect to this provision of the custody order).

'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." ***L.A.K.***, 265 A.3d at 592; ***see also B.,N.M.***, 856 A.2d at 855 ("Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances.").

Moreover, we determine Father's reliance upon ***B.D.S.***, ***supra***, is misplaced. In ***B.D.S.***, the mother of a minor child filed a petition for involuntary termination of child's father's parental rights. ***B.D.S.***, 431 A.2d at 204. The mother invoked the predecessor statute to Section 2511(a)(1), and claimed that 1) father had failed to perform parental duties for child; and 2) father's "conduct toward said child evidence[d] a settled purpose of relinquishing parental claim to said child." ***Id.*** (citation and footnote omitted). The trial court denied mother's petition and found that mother and the family of her new husband had 1) engaged in a course of conduct intended to obstruct father's relationship with child; and 2) thwarted father's repeated efforts, spanning over three years, to contact child by mail, telephone, and attempts to deliver gifts to child at mother's residence. ***Id.*** at 206; ***see also id.*** at 205-06, 208.

The mother appealed the denial of termination; the ***B.D.S.*** Court affirmed and reasoned as follows:

- 20 -

> Although we have held that a parent must make an effort to maintain communication and association with his or her child, **Adoption of McCray**, 460 Pa. 210, 331 A.2d 652 (1975), all circumstances must be considered when analyzing a parent's performance or non-performance of parental obligations. **In re R.W.B.**, 485 Pa. 168, 401 A.2d 347 (1979). ….
>
> The instant matter is unlike a case where a parent offers excuses why contact with the child did not occur. It is instead a case involving a pattern of obstacles and avoidance on the part of the mother and her new husband aimed at thwarting the father's attempts to maintain a parental relationship with his child.

**B.D.S.**, 431 A.2d at 207-08.

Instantly, unlike the situation in **B.D.S.**, there is no indication from the record that Mother's stoppage of Father's supervised visits was improper or intended to thwart Father's relationship with Child. Rather, under the custody order, Mother, who had primary physical and sole legal custody, had to agree to when and how often Father could visit Child. **See** Orphans' Court Opinion, 7/30/24, at 3 (unpaginated); **see also** N.T., 6/27/24, at 6, 39.

The record reflects that, for the majority of Child's life, Father has been absent. Shortly after Child's birth, Father was incarcerated for several years. Although Father had supervised visits with Child for two years following his release from prison, Father has not had any contact with Child since April 2023, well over the statutory six-month period of Section 2511(a)(1). We have recognized that a child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." **In re Adoption of**

- 21 -

***R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006); ***see also In re Adoption of***

***B.G.S.***, 240 A.3d 658, 665 (Pa. Super. 2020) ("[A] parent does not perform

his … parental duties by displaying a merely passive interest in the

development of a child."). Accordingly, we conclude the orphans' court did

not abuse its discretion in finding that clear and convincing evidence exists to

warrant termination of Father's parental rights under Section 2511(a)(1).

Father's first issue merits no relief.

Because the evidence supports termination under Section 2511(a), we

next examine Child's needs and welfare pursuant to Section 2511(b), which

Father addresses in his second issue. Father claims the orphans' court erred

in determining that clear and convincing evidence exists to warrant

termination of his parental rights pursuant to Section 2511(b), as termination

is not in Child's best interest. ***See*** Father's Brief at 34-45. Father argues that

> Mother did not [] offer any testimony whatsoever to establish a
> lack of bond between Father and the Child. Also, the [orphans'
> c]ourt did not make a finding that Mother was credible in any
> testimony that Father lacked a bond with the Child.

***Id.*** at 39; ***see also id.*** at 36 ("[T]he only witnesses who testified in Mother's

case-in-chief were Mother herself" and Stepfather, both of whom "concede

that they have never observed visits between Father and the Child," and failed

to offer "even an opinion as to whether or not there is a bond between Father

and the Child."). According to Father, at the termination hearing, he,

Paternal Aunt, and Paternal Grandmother "provided uncontroverted testimony

of an obvious[,] positive bond between Father and Child." ***Id.*** at 37; ***see also***

*id.* at 38 (Father claiming he and his witnesses "testified as to constant hugging, kissing and other signs of affection shown from Father to Child, as well as from Child to Father.").

Father asserts that "Mother offered no evidence that terminating the obvious bond [between Father and Child] would have no ill effects on the Child." *Id.* at 37. Father points out that

> [n]o bonding study was performed by any expert witness or professional of any kind. No supervised visits were observed by any therapists or professionals of any kind. There was no testimony whatsoever of any witness concluding that there is a lack of bond between Father and Child, or that terminating the obvious bond would not be harmful to the Child.

*Id.* at 38.

Mother counters the orphans' court properly exercised its discretion in finding clear and convincing evidence exists that Child's best interests are served by termination of Father's parental rights, pursuant to Section 2511(b). *See* Mother's Brief at 10-11. Mother emphasizes that

> Father's own testimony at the time of the [termination] hearing indicated that for five of eight years that the Child has been alive, [] Father has had little or no involvement with the Child, and has never taken on the nurturing role that a Father should. Father never provided any examples of how he has provided for the developmental, physical and emotional needs[] and welfare of the Child. Father … also failed to demonstrate any future ability to provide for these needs of the Child.

*Id.* at 11 (capitalization modified); *see also id.* at 10-11 (asserting the testimony at the termination hearing established Father's history of substance

abuse and psychotic episodes, and his "inability to address these issues and maintain sobriety.").

Attorney Eshelman agrees with Mother that clear and convincing evidence exists to warrant termination under Section 2511(b). **See** Participant's Brief at 13-15. Attorney Eshelman asserts Mother and Stepfather testified at the termination hearing that 1) "[C]hild has a loving bond with Stepfather"; 2) "Stepfather tends to Child's physical, educational and emotional needs"; and 3) Stepfather "intends to adopt Child and continue to be the father that Child deserves." **Id.** at 14. Attorney Eshelman further claims there was no evidence presented that any bond existed between Child and Father:

> Testimony was offered and unrefuted that Child did not want to see or speak with Father. Father could have requested that the [C]hild be interviewed *in camera* if [Father] felt that there was a bond that Child would testify to. Father failed to do so.

**Id.** at 15.

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the primary consideration must be the child's developmental, physical and emotional needs and welfare." **K.T.**, 296 A.3d at 1105 (quotation marks omitted). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." **In re C.W.U., Jr.**, 33 A.3d 1, 6 (Pa. Super. 2011) (citation omitted). "Notably, courts should consider the matter from the child's perspective, placing [their] developmental, physical, and

emotional needs and welfare above concerns for the parent." ***K.T.***, 296 A.3d at 1105.

The trial court must also "consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." ***Interest of: J.R.R.***, 229 A.3d 8, 12-13 (Pa. Super. 2020) (citation and quotation marks omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." ***K.T.***, 296 A.3d at 1113; ***see also T.S.M.***, 71 A.3d at 268 ("[T]he mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition."). Our caselaw "indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." ***K.T.***, 296 A.3d at 1109.

Here, regarding Child's best interests under Section 2511(b), the orphans' court found as follows:

> Mother informed the [orphans'] court of having continued concerns over Father being able to address the developmental, physical, and emotional needs and welfare of the Child. Father has not seen nor spoken with the Child in over a year. Mother reported concerns over Father's substance abuse issues, as evidenced when Father communicated his relapse struggles to Mother. Additional apprehensions were raised by Mother over Father's anger. Conflicting testimony was presented to the court regarding … [the] road rage incident involving Father while the [] Child was in the vehicle. It is unclear as to what took place during

the incident, so the court will not consider it for purpose of terminating Father's rights. As previously discussed, Father sent cards and poems to the [] Child while incarcerated but, upon release, stopped sending cards/gifts to the Child, with the exception of one birthday present. Father has only reached out on ten [or fewer] occasions to request visits with the Child, and did not reach out for any updates on the Child's well-being. Father never filed to modify custody after Mother objected to Paternal Grandmother and/or Paternal Aunt act[]ing as supervisor(s) for Father's visits. Father has never financially provided for the Child nor has Father taken an active role in ensuring the Child's developmental, physical, and emotional needs were being addressed. For five of the eight years that the Child has been alive, Father has had minimal involvement and has not taken on the nurturing role that a Father should. Father provided no examples of how, since the Child's birth, he has provided for the Child's developmental, physical and emotional needs and the welfare of the Child. Excluding environmental factors outside of Father's control, Father has not demonstrated any indication of addressing the [orphans'] court's concerns in the future.[FN]

> [FN] The court recognizes Paternal Grandmother's obvious affection for the Child, and hopes that if it continues to be a positive influence on the [] Child, the relationship can be maintained.

Orphans' Court Opinion, 7/30/24, at 9-10 (unpaginated) (footnote in original; capitalization and punctuation modified).

Our review confirms the orphans' court's findings are supported by the record, and free of legal error. Mother and Stepfather tend to Child's physical, educational and emotional needs, and give Child love, stability, safety, and support. At the time of the termination hearing, Child had not seen Father for

over a year,[13] and Father had previously been absent from the majority of Child's life. Significantly, Mother testified that she asked Child, "multiple times …, hey, do you want to give [Father] a phone call, [and] do you … miss your dad[? Child's] answer is always no." N.T., 6/27/24, at 21. Mother stated that Child has known and lived with Stepfather for the majority of Child's life. *Id.* at 12. According to Mother, Stepfather has been a "consistent, stable[,] loving father figure that provides for [Child], takes care of [Child, and] does the things that a father is supposed to do." *Id.* Mother testified that Child is bonded to Stepfather, elaborating that "[Child and Stepfather are] buddies. They've been buddies from the start. They like to … go and do fun boy things together, and I think that [Stepfather] is somebody [whom Child] looks up to." *Id.* at 15.

Stepfather testified he is a consistent father figure to Child, and Stepfather intends to adopt Child if termination is granted. *Id.* at 33-34; *see also id.* at 36 (Stepfather testifying that "[Child] comes up and hugs me a lot. He says, I love you. He'll give me kisses. I return [affection] to him. I'll tell him I love him. He's always wanting to do stuff [with Stepfather].").

Additionally, Attorney Eshelman argued at the termination hearing that termination of Father's parental rights was in Child's best interest "based on

---

[13] Although Father presented evidence of a parental bond through his testimony and that of Paternal Aunt and Paternal Grandmother, that evidence is stale in light of the absence of contact between Father and Child for the year prior to the termination hearing.

[Attorney Eshelman's] interview with the Child and [] observations" during the termination hearing. *Id.* at 115.

We acknowledge this is a close case and that the limited record could support a contrary determination. However, we reiterate and emphasize the "highly deferential" nature of our standard of review, and that we may not reverse "even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d at 849; *see also L.A.K.*, 265 A.3d at 597 ("[I]n termination cases involving close calls, deference to the trial court's determination is particularly crucial."); *S.P.*, 47 A.3d at 826 ("[A]n appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment[.]"). We discern no abuse of the orphans' court's ample discretion in determining that clear and convincing evidence exists to support termination of Father's parental rights under Section 2511(b). Accordingly, Father's second issue merits no relief.

In his final issue, Father claims the orphans' court erred in terminating his parental rights, where Child was deprived of his right to legal counsel under 23 Pa.C.S.A. § 2313(a) ("The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents."). *See* Father's Brief at 45-49.[14]

---

[14] Although Father raised this issue in his Rule 1925(b) concise statement, the orphans' court did not address it in its Rule 1925(a) opinion or elsewhere. *See* Concise Statement, 8/29/24, ¶ 7; *see also generally* Orphans' Court Opinion, 9/3/24.

Father asserts the orphans' court did not 1) "make any findings regarding whether the Child's legal position was made clear to the [c]ourt or even whether any testimony whatsoever was offered with regard to the Child's legal position," *id.* at 46-47; or 2) "specifically make a finding on the record that [Attorney Eshelman] could also represent the Child's [legal] interest, without a conflict[.]" Father's Reply Brief at 4; *see also* Father's Brief at 48 (emphasizing that Attorney Eshelman "did not state or in any way represent to the [orphans' c]ourt, through her closing statement [at the termination hearing,] or through any questioning of any witnesses, the position that the Child takes regarding termination of his Father's parental rights.").

Attorney Eshelman counters in her participant's brief that no violation of Child's Section 2313(a) rights occurred, where "it was put on the record that [Attorney Eshelman] interview[ed] the [C]hild and based on [the interview and Attorney Eshelman's] courtroom observations, she recommended termination of [Father's] parental rights." Participant's Brief at 16 (citing N.T., 6/27/24, at 115). Attorney Eshelman emphasizes that at the termination hearing, she replied in the affirmative to the orphans' court's question as to whether she believed she could represent "[C]hild's legal and -- all the interests?" *Id.* (quoting N.T., 6/27/24, at 81). According to Attorney Eshelman,

> the Pennsylvania Supreme Court has stated specifically that the record need not reflect the wishes of the child [regarding termination of a parent's rights], from which the child's legal interests could be surmised, in order to determine whether a

[GAL] had represented the legal interests of the child in addition to the best interests of the child. The [orphans'] court need only place on the record that the [GAL] was able to represent the legal interests and the best interests of the child without conflict. *In re Adoption of K.M.G.*, 240 A.3d 1218 (Pa. 2020).

Participant's Brief at 15-16 (citation modified).

With little analysis, Mother agrees with Attorney Eshelman. *See* Mother's Brief at 11 (asserting the orphans' court properly "terminat[ed] Father's parental rights to the [C]hild and accept[ed] the recommendations of" Attorney Eshelman).

With respect to Section 2313(a), our Supreme Court has stated that "[t]he termination of parental rights is a grave matter with far reaching consequences for the parents and the child. For this reason, our General Assembly has mandated that children be given a voice in termination proceedings." *In re P.G.F.*, 247 A.3d 955, 963 (Pa. 2021). "Generally, an attorney acting as a child's legal counsel must, at a minimum, attempt to ascertain the child's preference and advocate on the child's behalf." *Id.* at 966.

Given the importance, and indeed, the statutory mandate, of having an individual dedicated to discerning and advocating for the child's legal interests, it is only when a child's best interests and legal interests do not diverge, or where the child's legal interests cannot be ascertained, that a court-appointed attorney may serve in the dual capacity of guardian *ad litem* and legal counsel; however, when there exists a conflict between a child's best interests and the child's legal interests, these interests must be represented by separate individuals.

*P.G.F.*, 247 A.3d at 964 (citation omitted).

Instantly, Attorney Eshelman expressly stated at the termination hearing that she 1) had interviewed Child shortly before the termination hearing; and 2) could represent Child's legal and best interests without a conflict. *See* N.T., 6/27/24, at 22, 81, 115. Although Father is correct that the record is silent regarding Child's preferred outcome, Attorney Eshelman was not required to place Child's preferred outcome on the record. *K.M.G.*, 240 A.3d at 1237 ("We observe that Subsection 2313(a) [] does not require counsel to place the child's legal interests on the record. Indeed, the statutory directive is to the court, not counsel."); *see also id.* ("While we recognize that it may be a best practice for a child's legal counsel to divulge the child's preferences in order to advocate for their client's preferred outcome, we find nothing in the language of the Adoption Act requiring that their preference be placed on the record, which instead only requires that the child be appointed counsel."). Accordingly, there is no merit to Father's claim that the orphans' court erred in failing to afford Child his statutory right to legal counsel.

Based upon the foregoing, we affirm the order involuntarily terminating Father's parental rights to Child under 23 Pa.C.S.A. § 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 02/19/2025